[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM
This is an action concerning a real estate sales commission allegedly due the plaintiff. The matter was heard some time ago by an attorney trial referee. For reasons not now relevant, a mistrial was declared. By agreement of the parties the case was submitted to me for disposition based upon the pleadings, the transcript of the hearing before the attorney referee, the exhibits, oral arguments, and supplementary briefs.
The facts are not in dispute. The defendant was the owner of real property. The plaintiff is a licensed real estate broker. On December 14, 1986 the parties entered into a listing agreement effective from December 15, 1986 to March 15, 1987 whereunder the defendant agreed to pay a commission of 5% to the plaintiff if he CT Page 2009 procured a purchaser within that time span for a price of $115,000. An employee of the plaintiff, who was a licensed real estate agent, interested Dr. and Mrs. Abriola in the property and this resulted in a sales contract at the listed price executed by the Abriolas on January 11, 1987 and accepted by the defendant on January 26. This contract was prepared by an employee of the plaintiff. The contract contained a mortgage contingency clause which reads:
 Buyer(s) to be able to secure a first mortgage from an accredited money lending institution or by assuming the present mortgage in the amount of $75,000.00 for a term of 30 years, at an interest rate of prevailing rate, and the Buyer(s) agree(s) to forthwith apply for such a mortgage and use the best efforts to secure same. If buyer(s) is (are) unable to obtain any commitments for said mortgage, all deposits shall be returned and this agreement shall become null and void provided the Buyer(s) notifies the Seller in writing of his inability to get any commitments for said mortgage no later than March 13, 1987.
Closing date was to be on or before April 1, 1987. The Abriola's did make a deposit of $1,000 on their execution of the sales agreement and an additional deposit of $10,500 upon the acceptance of the agreement by the defendant.
The Abriola's applied to Danbury Savings and Loan Association for a mortgage and as of February 11, 1987 they did obtain a commitment for a term of 15 years in the amount of $70,000 with an interest rate of 8.75 percent. The opening paragraph of the notice from the Association reads:
 (A) This is a provisional approval of your loan application because we are still missing some information about your credit history and/or financial condition. We will not be able to give you a final loan approval until we receive all information listed below in Section III(D)(14).
In III(D)(7) there is a requirement of an appraisal showing the property to have a value of at least $250,000. I have to regard this as a typo. CT Page 2010
III(D)(14) requires proof of current employment, proof of current savings and checking account balances and proof of current mortgage loan balance(s) on the mortgaged property. By its terms, the commitment will end on March 26, 1987.
The commitment in I B(2) also required credit reports meeting the Association's underwriting criteria. This apparently arose from an adverse notation concerning credit card problems which arose because of use by a thief of a stolen credit card. Other requirements concerned payment of customary fees such as appraisal cost, points, insurance and like items. The Abriolas received verbal assurances from the Association that in due course they would receive a firm commitment. Such a commitment was not forthcoming as of March 11, so as of that date the Abriola's attorney advised the defendant in writing that they did not have a firm commitment and requesting an extension for one week. By letter dated March 13 the attorney for the defendant informed the attorney for the Abriolas that the request for an extension was denied by the defendant. On March 16 Danbury Savings and Loan issued to the Abriolas a firm commitment for a mortgage. This commitment did not mention amount, duration or interest rate so presumably those items continued to be governed by the provisional commitment of February 11. By letter dated March 16 the Abriola's attorney advised the defendant's attorney that they had obtained a firm commitment acceptable to them. By letter dated March 18 the defendant's attorney advised the Abriola's attorney that the defendant did not wish to renegotiate the contract and that he considered it terminated by the letter of March 11 advising that the Abriolas did not have a firm commitment by the contract date of March 13. He also requested the plaintiff to refund to the Abriolas the deposit which had been held in escrow, and such refund was made.
At the hearing before me there was offered in evidence a letter of March 19 from the attorney for the Abriolas to the attorney for the defendant which upon objection was marked for identification only with the understanding that I would make a decision after review of the entire file and record as to whether or not it should be admitted as a full exhibit. For what it's worth, I have decided to admit it. The substance is a statement that the Abriolas continue to regard the contract as binding and they reserved the right to pursue either specific performance or damages. In fact they took no action, and as of this date the defendant remains the owner of the premises.
If the sales contract remained viable after March 13, 1987 despite the letter of March 11 advising that there was no firm mortgage commitment, then the plaintiff did provide a prospective purchaser ready, willing and able to buy, and is therefore entitled to a commission. If it became null and void as of March CT Page 2011 13, he is not.
A key consideration is the meaning of the contract and particularly the mortgage contingency clause. In this connection it is important to keep in mind that the contract was prepared by an employee of the plaintiff and therefore any ambiguity must be resolved against him.
Black's Law Dictionary, Sixth Edition, gives the following definitions:
 Commitment: Agreement or pledge to do something; e.g. a statement by a lender that a loan will be made under certain terms. Commitments may be of various types, that is, a conditional commitment, subject to certain items being met, or a firm commitment, which is binding on the lender without conditions.
 Any: some, one out of many, an indefinite number. One indiscriminately of whatever kind or quantity. "Any" does not necessarily mean only one person, but may have reference to more than one or to many.
 Word "any" has a diversity of meanings and may be employed to indicate "all" or "every" as well as "some" or "one" and its meaning in a given statute depends upon the context and the subject matter of the statute. Donahue v. Zoning Board of Appeals of Town of Norwalk, 155 Conn. 550.
Insofar as "any commitment" can be interpreted in different ways, the interpretation most against the plaintiff must be adopted. In the context of a sales contract, I have to conclude that a prospective buyer would want "out" of any obligation unless he had definite assurance that sufficient funds would be available to him to enable him to perform. Therefore I interpret the words as referring to a firm commitment, which the Abriolas did not have as of March 13,
The next question is whether or not time is of the essence realizing that on March 16, only three days after the contract stipulated deadline, the Abriolas did obtain a firm commitment. I am aware of such cases as Kahalik v. Bernardo, 184 Conn. 386 which hold that in general there should be a liberal attitude toward CT Page 2012 deadlines in real estate sales contracts. However, in this case the contract is very specific that if the Abriolas did not have a firm commitment and so notified the defendant by March 13, the contract would be null and void. Further, the parties to that contract clearly interpreted it as imposing an absolute deadline, for the Abriolas asked for an extension and the defendant denied it. I do not regard the letter of March 19 persuasive that the Abriolas effectively changed from that position. It obviously was simply an attempt to protect their rear guard in the event they ultimately decided upon litigation, which they did not do.
Judgment may enter for the defendant.
J. HEALEY, STR